226 S.W.2d 366 (1950)
In re DELANY.
No. 27559.
St. Louis Court of Appeals, Missouri.
January 17, 1950.
Rehearing Denied February 17, 1950.
*367 John T. Sluggett, St. Louis, for appellant.
C. P. Fordyce, St. Louis, for respondent.
BENNICK, Commissioner.
This is a proceeding which was instituted in the Probate Court of the City of St. Louis upon an information charging that one Elizabeth S. Delany of said city was a person of unsound mind and incapable of managing her affairs. The information was filed on May 9, 1947, and the informant was Kathleen Franciscus, who is also a resident of the City of St. Louis, and has known Mrs. Delany since 1919.
Mrs. Delany is the widow of John O' Fallon Delany, who died in 1930. She resides at 5105 Lindell Boulevard, to which she moved with her husband about 1910, and where she has continued to make her *368 home in all the intervening years. While Mrs. Delany apparently regarded herself as eighty-nine years of age at the time the information was filed, there was evidence that according to the family history she was born on April 29, 1856, which would mean, if such history was correct, that she actually lacked but a month of being ninetyone years of age. The informant is of no blood relation to Mrs. Delany, and has no kinship with her except through her husband, Lindsey Franciscus, who was related in some degree to Mr. Delany. However the informant had had certain business dealings with Mrs. Delany over a period of some fourteen years, and had also been accustomed to visit her socially on an average of once a month from 1919 until 1945. She had not seen Mrs. Delany for the last two years prior to the time the information was filed in the probate court.
The Delanys had no children, and at the time the information was filed Mrs. Delany's closest blood relatives were second cousins, of whom there were several, including William T. Tracy of Richmond, Virginia, and Marie Tracy Wygant of Washington, D. C., both of whom testified as informant's witnesses at the trial.
The record is replete with references to Margaret Watson (formerly Margaret Smith); her daughter, Marie Smith; and the latter's daughter, Elizabeth Martin, who was born of Marie's marriage to one Robert Martin. Margaret was employed by Mrs. Delany as a cook some time around 1917 or 1918, and continued to serve in that capacity and live in the Delany home until 1925, when she divorced her husband, Smith, and married a man named Watson, with whom she moved to a different address. About 1928 Margaret moved back to the Delany premises, where she remained until 1931, when Mrs. Delany bought her a home of her own in another part of the city. It seems that Margaret throughout all the years had never ceased to perform services of one sort or another for Mrs. Delany, and in 1944 she came back to work for her regularly as housekeeper, nurse, and companion.
Marie was about four years of age when Margaret first moved into the Delany home, and being attractive and personable she soon won the affection of Mrs. Delany, whose fondness for the child in the absence of children of her own developed into something akin to parental love. Mrs. Delany in particular desired that Marie be reared as a member of the family, and entertained the theory that regardless of the child's previous environment she could become a very proper person if allowed to grow up in the character of surroundings that the Delany household would afford. Mrs. Delany apparently felt that Margaret's influence over the child was bad, and there was evidence that Mrs. Delany's reason for purchasing a home for Margaret in 1931 was to remove her from contacts with Marie, who remained in the Delany home after her mother and stepfather moved to the new address. Mr. Delany was seemingly not so impressed with the idea of accepting the child into the home and rearing her as one of the family; and whether or not it was due to his misgivings in the matter, Mrs. Delany in any event refused to adopt Marie and give her the Delany name, although both Margaret and Marie importuned her to do so. Nevertheless Mrs. Delany supported Marie, saw to it that she had the opportunity for an education, and maintained her in the home as though she were in fact her own flesh and blood.
Marie married Robert Martin in 1931, and, as we have already pointed out, it was of this marriage that Elizabeth was born a year later. Subsequently the marriage to Martin was dissolved by divorce, as were three additional marriages which Marie contracted. Her fifth marriage was to one August Schaefer, with whom she was living in California at the time the information was filed, although at the inception of their marriage she and Schaefer lived for a time with Mrs. Delany. In fact, after her divorce from Martin, Marie had returned to the Delany home with Elizabeth, and at intervals thereafter in the periods between her succeeding marriages she and Elizabeth had followed the same course.
On April 20, 1947, Margaret telephoned Marie Tracy Wygant in Washington, D. *369 C., advising her that Mrs. Delany was ill, and suggesting that she come to St. Louis. Mrs. Wygant arrived in St. Louis two days later, and went at once to the Delany home, which was occupied at the time by Mrs. Delany, Margaret, Elizabeth, and a housemaid named Katie.
Mrs. Delany recovered from her illness, but during the time that Mrs. Wygant was in St. Louis, she made inquiries about Mrs. Delany's financial affairs, and spoke with several persons, including Kathleen Franciscus, who suggested that she consult Mr. C. P. Fordyce, an attorney at law. Mr. Fordyce thought that the situation warranted the institution of an insanity proceeding, but recommended that before an information was filed, Dr. Robert M. Bell, a psychiatrist, should be employed to examine Mrs. Delany and render an opinion as to her sanity. In fact, Mr. Fordyce made the necessary arrangements with Dr. Bell, who went to the Delany home the following day, and after a conversation with Mrs. Delany concluded that she was of unsound mind and incapable of managing her affairs. Mrs. Wygant and Mrs. Franciscus had meanwhile conferred with each other regarding the institution of the proceeding, and on May 9, 1947, the information was filed by Mrs. Franciscus as has already been indicated.
It seems that Mrs. Delany's estate at the time the information was filed consisted of a commercial building located on the southwest corner of Tenth and Locust Streets in downtown St. Louis; her residence at 5105 Lindell Boulevard; four summer cottages in Douglas, Michigan; and the contents of the residence, embracing many articles of household furnishings. The commercial building was valued at a figure from $310,000 to $325,000, subject to a first deed of trust in the sum of $70,000, which had been executed on February 18, 1947, in lieu of a previous deed of trust for $45,000. The residential property had an assessed valuation of $19,000.
At the hearing in the probate court Mrs. Delany was adjudged to be a person of unsound mind and incapable of managing her affairs. She had been represented at such hearing by Walter L. Ross of the local bar, and at the conclusion of the hearing he was appointed as her guardian.
Thereafter John T. Sluggett, also of the local bar, appeared in the probate court as attorney for Mrs. Delany, and took an appeal to the circuit court. On December 1, 1947, the case came on for trial in Division 4 of the circuit court before Judge Robert L. Aronson and a jury, and progressed until December 12th, when a mistrial was declared because the jurors could not agree upon a verdict.
On January 8, 1948, following such mistrial in Division 4, and before the case was again reset, Mrs. Delany executed what purported to be an irrevocable trust indenture by which she conveyed to John T. Sluggett III, the son of her then attorney, her property and estate of every kind and character to hold the same in trust upon certain prescribed terms and conditions and for certain prescribed uses and purposes.
After making certain provisions for Mrs. Delany's support during her lifetime, the indenture provided that upon her death her interest in the trust should cease and terminate, and that the trustee should thereafter hold the estate in trust for the benefit of Margaret and Marie and pay over the income to them in equal shares so long as each should live. Upon the death of either, it was provided that the survivor should receive the entire net income, and that upon the death of both, the trustee should thenceforth hold the estate for the benefit of Elizabeth until the time fixed for the termination of the trust. Upon Elizabeth's death, the trust, if not sooner terminated, was to become a part of her estate; and in the event she died before both Margaret and Marie, then upon the death of the survivor as between Margaret and Marie, the trust fund was to become a part of the estate of such survivor, and be distributed according to such survivor's last will and testament, or to the next of kin of such survivor according to law.
On April 5, 1948, the second trial was commenced in Division 5 of the circuit court before Judge Francis E. Williams and a jury, and was concluded on April 22d *370 with the return of a verdict of nine jurors finding Mrs. Delany to be of unsound mind and incapable of managing her affairs. Judgment was entered on the verdict; and following an unavailing motion for a new trial, Mrs. Delany's attorney gave notice of appeal on her behalf, and then took the necessary steps to cause the case to be sent to this court for our review. Appellate jurisdiction having been brought into question, the case was transferred from this court to the Supreme Court, which thereafter remanded the case to this court, thereby establishing that appellate jurisdiction is with us.
But while the matter of appellate jurisdiction is now settled, there is a question seriously urged as to whether the probate court in the first instance, and the circuit court on appeal, acquired jurisdiction to adjudicate as to whether Mrs. Delany was a person of unsound mind and incapable of managing her affairs.
The question involves the legality of certain proceedings in the probate court in regard to the calling of a special term for the purpose of holding an inquiry upon the information which had been filed while the court was in vacation, as well as in regard to the election of a special judge when the regular judge was unable to hold court at the appointed time.
It is provided by Section 448, R.S.Mo. 1939, Mo.R.S.A. § 448, that in the event the information in an insanity proceeding is given to the probate judge in vacation, he shall call a special term of the court for the purpose of holding an inquiry whether the person mentioned in such information be of unsound mind or not.
In the portion of the statutes dealing generally with probate courts, it is provided by Section 2458, R.S.Mo.1939, Mo. R.S.A. § 2458, that whenever the probate judge shall be unable from any cause to hold any term or part of term of court, the attorneys who are present, but not less than five in number, may elect one of their members then in attendance, having the qualifications of a probate judge, to hold the court for the occasion or for a part of a term.
It is then provided by Section 2459, R.S.Mo.1939, Mo.R.S.A. § 2459, that the election shall be held by the clerk of the court, if there be one, and if not, by the sheriff of the county. In the event of a tie, the clerk, if there be one, or if not, the sheriff of the county, shall cast the deciding vote; and the clerk of the court, if there be one, and if not, the sheriff of the county, shall enter the proceedings of such election on the probate records of that day.
When Kathleen Franciscus filed the information on May 9, 1947, the probate court was in vacation, the March term having been adjourned on the preceding April 26th. The next regular term was the June term, which was not to convene until June 2, 1947.
Upon the filing of such information in vacation, the probate judge did not call a special term of court limited to the single purpose of holding an inquiry as to whether Mrs. Delany was a person of unsound mind or not. However before the adjournment of the March term, the court, during such regular term, had made and entered an order that a special term be held on May 13th and 14th for the transaction of general business; and when the information in question was filed, the judge made an order that the inquiry be held on May 14th, which was one of the days previously designated for the special term.
As we shall presently point out, the judge's action in setting the inquiry as he did is attacked as not having been in conformity with the requirement of Section 448. However there was still other difficulty yet to be encountered.
On May 13th, upon the convening of the special term at which the inquiry had been set, Judge Glendy B. Arnold, the regular judge of the probate court, was unable to hold court, whereupon F. Leland Carpenter, the clerk of the court, proceeded to hold an election for the election of a special judge under the provisions of Sections 2458 and 2459. Carpenter was also an attorney possessing the qualifications of a probate judge, and one of the attorneys present in court and participating in the election put him in nomination for special judge.
*371 Carpenter thereupon disqualified himself from any further part in holding the election in his capacity as clerk, and requested the sheriff to conduct the further proceedings, which the sheriff did, and which resulted in Carpenter's election as special judge.
Having taken his oath of office, Carpenter proceeded to hold the special term of court as special judge, and on May 14th, at the request of Walter L. Roos, Mrs. Delany's then attorney, called a special term for May 16th for the hearing of the Delany matter only, and continued and reset the case for that day. On May 16th Judge Arnold, the regular judge, acting under the orders theretofore made by Carpenter, proceeded to conduct the inquiry as to Mrs. Delany's sanity, and at the conclusion of the hearing entered judgment that she was of unsound mind and incapable of managing her affairs.
As we have already pointed out, Walter L. Roos was the attorney for Mrs. Delany during all these proceedings; he requested the continuance from May 14th; he participated in the hearing on May 16th without objection; and at the conclusion of the hearing, instead of appealing, he accepted appointment as Mrs. Delany's guardian. However on June 3d, during the June term which had meanwhile convened, John T. Sluggett entered his appearance as attorney for Mrs. Delany and took an appeal to the circuit court, where he filed a motion to dismiss the proceeding, which motion was overruled, and of which action he is now complaining in his appeal to this court.
In assailing the proceedings in the probate court, counsel for Mrs. Delany first argues that Judge Arnold, in setting the inquiry on one of the days of the special term which had already been called during the previous regular term time, failed to observe the requirement of Section 448, which specifies that the judge, whenever an information is given in vacation, shall call a special term for the purpose of holding an inquiry as to the sanity of the person mentioned in the information. In other words, he insists that the provision for the judge to call a special term is mandatory and leaves nothing to his discretion; that a valid inquiry upon an information filed in vacation can only be held at a special term called by the judge for the single purpose of holding such inquiry; and that the judge was therefore without authority to set the inquiry for one of the days of a special term which had theretofore been called by the court (as distinguished from the judge) during regular term time, and not by the judge (as distinguished from the court) during vacation.
As for the further proceedings in the probate court, counsel argues that since Carpenter was the clerk of the court at the time of the election of a special judge on May 13th, it was necessary that he, as clerk, should conduct the election; that he was without authority to disqualify himself as clerk and turn over the holding of the election to the sheriff so that he himself could be elected special judge; that since his purported election as special judge was invalid (as counsel claims) because in contravention of the statutory procedure provided in such cases, all acts thereafter done by him in the capacity of special judge were void, including the order calling the special term for May 16th and continuing the inquiry from May 14th to that day; and that the hearing on May 16th was consequently void (the court being actually in vacation if Carpenter's order calling such special term was void), and was not validated by the fact that it was Judge Arnold, the regular probate judge, who held the hearing on May 16th and adjudged Mrs. Delany to be a person of unsound mind and incapable of managing her affairs.
Going a step further, counsel points out that if he is correct in his insistence that the proceedings in the probate court were void, then the proceedings on appeal in the circuit court were likewise void, since the circuit court's jurisdiction on appeal from the probate court is purely derivative, and is no greater and no less than that which the probate court might itself have lawfully exercised. State ex rel. Kinealy v. Hostetter, 340 Mo. 965, 104 S.W.2d 303; Evans v. York, Mo.App., 195 S.W.2d 902, Id., Mo.App., 216 S.W.2d 124; In re Helm's Estate, Mo.App., 136 S.W.2d 421.
*372 If counsel's complaints seem technical on first consideration, it is to be remembered that the probate court is a court of special and limited jurisdiction, which must be exercised in substantial compliance with the manner prescribed. Dietrich v. Jones, 227 Mo.App. 365, 53 S.W.2d 1059; In re Moore's Guardianship, Mo. App., 148 S.W.2d 116. Consequently the way in which a probate court has disposed of a particular matter before it is always a fair subject of inquiry where there is any reasonable basis for the assertion that it has deviated in any material respect from the course that has been laid down for it.
But while the points made by counsel are not to be lightly brushed aside, we do not find that the matters of which he complains sufficed to invalidate the proceedings in the probate court.
In the first place, it does not necessarily follow that the requirement of Section 448 for the calling of a special term by the judge in vacation may not be satisfied by setting the inquiry at a special term already called by the court during regular term time.
As the informant says, the obvious purpose of Section 448 is to prevent undue delay in conducting a hearing upon the question of a person's sanity when the information is given during vacation. In other words, the aim of the statute is to authorize the judge to call a special term if such action is necessary for the protection of both the public and the one whose sanity is to be the subject of the inquiry, but it does not say that such inquiry may not be held at a special term already called. Indeed, were the statute to be construed as forbidding an inquiry where the information is filed in vacation except at a special term called for the single purpose of holding such inquiry, then in many instances it would defeat its own purpose, as where such special term would have to await the adjournment of either a special term already called, or of the next regular term which might convene immediately.
Similarly the provision of Section 2459 that the election of a special judge shall be held by the clerk, if there be one, need not be construed as absolutely disqualifying the clerk from election as special judge. On the contrary, the clause, "if there be one", may be reasonably construed to imply that the election shall be conducted by the clerk, if there be one who is able to act and who has not disqualified himself for any good and sufficient reason. A case might readily be imagined involving the election of a special judge where there was a clerk in office, but who was away from court on account of illness. Surely in such an instance the sheriff would not be precluded from conducting the election, nor do we believe that he was precluded in this instance where the clerk had disqualified himself because he had been put in nomination for special judge. The important thing is that Carpenter, even though he was the clerk, none the less possessed the qualifications for the office of special judge; and having been elected, and having subscribed the oath of office, none of his subsequent acts in the capacity of special judge were to be avoided upon the ground of the invalidity of his election.
While counsel has presented his point as an attack upon the probate court's jurisdiction, the truth is of course that the probate court not only had jurisdiction, but that its jurisdiction was in fact exclusive. What counsel is actually complaining of is the manner in which the probate court proceeded to exercise its jurisdiction, in which connection we are again reminded that Mrs. Delany's then attorney participated without objection in everything that was done, and indeed requested certain of the orders which were entered by Carpenter as special judge, and which are now the subject of complaint on this appeal. There was nothing done which was fatal to the jurisdiction of the court, and the motion to dismiss was properly overruled.
For her next point Mrs. Delany complains of the action of the court in refusing to direct a verdict in her favor both at the close of the informant's evidence and at the close of all the evidence. The contention is that the informant's expert witnesses did not show that they had acquired sufficient knowledge of Mrs. Delany's condition to qualify them to express an opinion of her *373 incompetency, and that on the whole the informant's evidence did not reveal any abnormal conduct on Mrs. Delany's part, or any conduct that could fairly be considered inconsistent with sanity.
Mindful of the necessity that one's liberty or right to control his property shall not be taken away or denied him except for the most cogent reasons, the law, in fixing the test of legal competency, has purposely and wisely set a low standard of capacity. For one to be held of unsound mind and incapable of managing his affairs, it is not enough that in the judgment of other persons he may lack sufficient intelligence and understanding to manage his affairs in the most prudent manner. On the contrary, for one to be held of unsound mind so as to be disqualified from the control of his own property, there must be such mental impairment as to render him incapable of understanding and acting with discretion in the ordinary affairs of life. To sav that one is of unsound mind in a legal sense imports not merely a weakness of understanding, but a total deprivation of it; and there is no basis for an adjudication that one is of unsound mind and incapable of managing his affairs unless it is shown that his powers of reasoning and comprehension have been so far destroyed or reduced by mental weakness resulting from one cause or another that he is incapable of knowing and appreciating the nature and consequences of his acts in respect to his own conduct and the management of his property. Harrelson v. Flournoy, 229 Mo.App. 582, 78 S.W.2d 895.
Three specialists in mental and nervous disorders, Dr. Robert M. Bell, Dr. James F. McFadden, and Dr. Robert E. Britt, all testified that Mrs. Delany was suffering from senile dementia, which is a mental disorder that is not only permanent, but in fact gets progressively worse. Nor, according to these doctors, was her condition such as was to be expected of any person her age, but instead her marked and absolute lack of memory for current events, and her lack of ability to retain current impressions, were things not normally true of old people who were free of the disorder with which she was afflicted. While evidencing a keen interest in things that had transpired in the remote past, she displayed an almost complete lack of concern for recent happenings. Dr. Bell testified from what he had observed in his examination of Mrs. Delany immediately prior to the time the information was filed in the probate court. Dr. McFadden drew his conclusions from what he had heard of Mrs. Delany's own testimony during the first trial of the case in the circuit court. Dr. Britt, as in the case of Dr. Bell, had conversed with Mrs. Delany in her home. Each of the doctors testified that his own individual examination or observance of Mrs. Delany had given him a sufficient opportunity to arrive at the conclusion which he had formed.
In addition to the medical experts, Judge Robert L. Aronson testified to his own observations of Mrs. Delany for the period of approximately two weeks that she had been before him on the occasion of the first trial in December, 1947. He testified, as had the doctors, to a multitude of things he had observed about her which were fairly to be regarded as abnormal and inconsistent with soundness of mind. Numerous other witnesses testified to like effect.
There was a great mass of evidence tending to show such matters as that Mrs. Delany was without any knowledge of the amount of or recent increases in the deed of trust on her downtown property; of the amount of money she owed; of the balances in her bank accounts; and of sales and leases made in her behalf. She could not recall the names of persons she should have known, nor did she remember the recent visits of several persons to her. To set out all these matters in detail would extend this opinion beyond all reasonable limits. Suffice it to say that if believed, they warranted the conclusion that Mrs. Delany's powers of reasoning and comprehension were so far destroyed or reduced as to have rendered her incapable of understanding and acting with discretion in the ordinary affairs of life, whether considered from the standpoint of her own personal conduct, or with respect to the management *374 of her property. Having all due regard for the standard which the evidence was required to meet, the question of whether Mrs. Delany was of unsound mind and incapable of managing her affairs was one for the jury to determine in the light of all the facts and circumstances of the case, and the motion for a directed verdict in Mrs. Delany's favor was properly refused.
But while we are convinced that a case was made for the jury, we are equally of the view that the verdict and judgment cannot be allowed to stand because of the admission of a great mass of evidence which was not only incompetent but highly prejudicial to Mrs. Delany's rights. Along with the broad charge of incompetency and irrelevancy, counsel makes the more specific complaint that much of the informant's evidence was hearsay, and that in many instances it pertained to situations and occurrences which were too remote to affect the question of Mrs. Delany's mental condition at the time of the trial, which was the question the jury were called upon to determine.
The evidence to which counsel objects covers a wide and varied scope, and involves a great multitude of incidents occurring throughout the trial. However, a large part of itand the part which counsel regards as particularly objectionable consisted of an attack upon the character of Mrs. Delany's foster daughter, Marie, as, for instance, by purporting to show that Marie's conduct and reputation in and around Douglas, Michigan, were bad during the summer of 1945, two years before the information was filed in the probate court. It will be recalled that Mrs. Delany owned four summer cottages in Douglas, one of which had been regularly occupied for fourteen years by the informant and her immediate family. The first three of the numerous witnesses to testify in the case were, successively, Edgar Franciscus, a son of the informant, Mary Franciscus Gleeson, a daughter of the informant, and the informant herself, all of whom were allowed to testify, over counsel's objection, in regard to Marie's conduct and reputation in and around Douglas in the summer of 1945. Their testimony is typical of the kind of evidence of which counsel complains; and the decision upon the question of the admissibility of their testimony is equally pertinent to the mass of other evidence which is embraced within the point now under consideration.
Edgar Franciscus was allowed to testify that he saw Marie and her subsequent husband, Schaefer, being forcibly ejected from a bar or night club in Saugatuck, Michigan, a town about three miles from Douglas, and that both of them were using abusive language. Although the witness had seen Mrs. Delany in Michigan several different times during the summer, she was not present on the occasion in question.
Mary Franciscus Gleeson was permitted to testify that she had discussed Marie's reputation with about thirty-five young people in Douglas, and that her reputation was very bad. The witness further testified that Marie had a reputation for drunkenness, and also for being a very loose woman; that she was not a peace-loving woman; that her reputation among the city officials of Saugatuck was not very good; and that the officials had ordered her out of Saugatuck for being a troublemaker. Asked what kind of trouble Marie had caused, the witness replied that it had consisted of fights and drinking and bringing men into the hotels.
The informant was allowed to testify that Marie had a reputation of being neglectful of Mrs. Delany, and of drinking to excess, having fights, and being out all night; that her reputation for morality was bad; that she was abusive with the tradespeople in Douglas; that she broke up a family in Michigan, and persuaded the husband to accompany her back to St. Louis; and that on one occasion the informant had seen her drunk in a store and yelling at the proprietor.
As has already been indicated, the bits of testimony referred to above constitute but an extremely small part of all the evidence which counsel insists was erroneously admitted, and would be multiplied many fold if we were to attempt to recite and deal separately with each particle of evidence to which objection is interposed. We must of course have a definite matter to rule *375 upon, and for this purpose we have selected the testimony of the three persons in question, not with any idea that their testimony was any more subject to objection than many other portions of the evidence against which counsel lodges his complaint, but rather for the reason that such testimony came in at the very beginning of the case and disclosed the wide range which the evidence was to be permitted to take. As a matter of fact, the legal point in controversy far transcends any question of the admissibility of any single bit of evidence, and instead involves the whole question of the latitude to which the evidence may properly go in a proceeding of this character where a person's mental capacity is the subject of the inquiry.
The question is simplified if we keep in mind that the ordinary rules of evidence apply in regard to the admissibility of evidence which is offered on the issue of insanity. 44 C.J.S., Insane Persons, § 5. It follows, therefore, that any evidence which is material and relevant to the question in issue will be admissible, while evidence that does not relate to the matter in issue will be inadmissible. The general rules having to do with the admissibility of hearsay evidence are no less applicable to a sanity case than to any other character of proceeding; and in every instance the evidence must have reference to the mental condition of the one informed against with a proper restriction against remoteness in respect to the time of the judicial investigation. Furthermore, any tendency to extend the latitude to be allowed in proof of mental incapacity must obviously never go so far as to deny fair protection to the one who is to be adjudged incompetent and be subjected to guardianship. It is a most serious thing to be declared of unsound mind, and no one should have such a judgment pronounced against him except upon a preponderance of clear and convincing evidence meeting all the tests of legal relevancy.
The question in this case was whether Mrs. Delany was of unsound mind and incapable of managing her affairs at the time of the proceeding to have her so declared. To accomplish this end we appreciate that the informant was not restricted to the opinions of medical experts, but was entitled to adduce evidence of any and all relevant and material circumstances fairly throwing light on the subject and indicative of acts and conduct on Mrs. Delany's part of an abnormal nature and inconsistent with her sanity.
How she reacted to the conduct of others, including that of her foster daughter, Marie, would undoubtedly have been a material factor where she was directly involved in or affected by such conduct or was in some manner called upon to respond to it. But how could her mental incompetency have been shown by proof that Marie was forcibly ejected from a night club in Saugatuck, Michigan, when Mrs. Delany was not present and was in nowise concerned with the incident? Nor how could it have affected the question of her capacity that Marie may have had a bad reputation among the inhabitants of Douglas for drunkenness, immorality, and the like? It was not Marie who was on trial, although a great part of the evidence was given over to condemning her along with her mother and her daughter.
Moreover the prejudicial nature of such evidence is readily apparent. Whether Mrs. Delany is adjudged of unsound mind not only determines her present right to control her property, but will undoubtedly affect the ultimate disposition of it as between Marie and her relatives on the one hand and Mrs. Delany's second cousins on the other. It would have been unavoidable that with so much of the evidence occupied with the question of Marie's bad conduct, the jury would not have been influenced to the point of losing sight of the real issue in the case. As we have already pointed out, it was proper to show such of Marie's conduct as might reasonably have served to evidence Mrs. Delany's rationality in reacting to it or dealing with it, but it was not competent, and was highly prejudicial, to open the gates to the extent of permitting the introduction of evidence of Marie's bad reputation among third persons, as well as of acts of specific misconduct on Marie's part with which Mrs. Delany was *376 in no way connected and which could not have reflected her mental operations.
Because of the irrelevancy of all such evidence to the matter in actual controversy, it is unnecessary to consider the question of whether any of the evidence was further objectionable upon the ground of hearsay or remoteness in point of time.
Other matters assigned as error and not specifically alluded to herein may not appear upon a retrial of the case.
For the error noted, it follows that the judgment of the circuit court should be reversed and the cause remanded; and the Commissioner so recommends.
PER CURIAM.
The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, reversed and the cause remanded.
ANDERSON, P. J., and HUGHES and McCULLEN, JJ., concur.