**In the Matter of Bess Brooks LONG, Alleged Incompetent.**

**Emma COFFMAN, Respondent,**

v.

**Bess Brooks LONG, Appellant.**

**No. WD 33278.**

Missouri Court of Appeals, Western District.

Nov. 9, 1982.

As Modified Feb. 8, 1983.

Larry K. Enkelmann, Gladstone, for appellant.

Don Witt, Platte City, for respondent.

Before MANFORD, P.J., and WASSERSTROM and KENNEDY, JJ.

KENNEDY, Judge.

Bess Brooks Long was found by the trial court to be incompetent and incapable of managing her property and caring for herself. The public administrator of Clay

County was appointed the guardian of her person and estate.

The alleged incompetent appeals. She was represented in the competency hearing and upon this appeal by her court-appointed attorney. Also appealing from the judgment is one Louie Doyle. Mr. Doyle apparently appeals as a "reputable citizen of the county in which the hearing occurred". Sec. 472.170, RSMo (Supp.1981). He also took an active part in the hearing, including filing an affidavit requesting a change of judge. Mr. Doyle operates Mrs. Long's farm in partnership with her, and has been managing her affairs.

Appellants claim there is no substantial evidence to support the trial court's judgment of incompetency. We find, however, that the judgment is supported by substantial evidence and affirm the same. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976).

The criterion for assessing the sufficiency of the evidence to prove a person's incompetence is thus set out by Judge Turnage in *Matter of Armstrong,* 573 S.W.2d 141, 144 (Mo.App.1978):

> The test by which such sufficiency is to be measured as to its sufficiency is set out in *In Re Delany,* 226 S.W.2d 366, 376[6] (Mo.App.1950) as follows: "[f]or one to be held of unsound mind so as to be disqualified from the control of his own property, there must be such mental impairment as to render him incapable of understanding and acting with discretion in the ordinary affairs of life .... and there is no basis for an adjudication that one is of unsound mind and incapable of managing his affairs unless it is shown that his powers of reasoning and comprehension have been so far destroyed or reduced by mental weakness resulting from one cause or another that he is incapable of knowing and appreciating the nature and consequences of his acts in respect to his own conduct and the management of his property. *Harrelson v. Flournoy,* 229 Mo.App. 582, 78 S.W.2d 895."

With that criterion in mind we proceed to examine the evidence.

The alleged incompetent at the time of the competency hearing, beginning in August, 1981, was 92 years of age. She had been a nursing home patient for more than two and a half years at the time. Her husband had died in January, 1978. She had continued to reside in her own home in Smithville for about a year after her husband's death, then had entered the nursing home after a hospital stay. She resided in the Kendallwood Nursing Home in Clay County for about a year, then was moved to the Lawson Nursing Home where she was located at the time of the hearing. Mrs. Long apparently had only collateral relatives, one of whom was the petitioner, Edna Coffman. Mrs. Coffman was a first cousin of Mrs. Long. She lived in Chicago. She had visited in Mrs. Long's home from time to time over a period of 50 years, usually spending a week or 10 days there. In January of 1978, at the time of Mr. Long's death, she had spent a month with Mrs. Long and had most recently visited her in May, 1981, in the nursing home at Lawson. Mrs. Coffman had visited Mrs. Long twice in a period of a few days in May, each visit for an hour to an hour and a half. Mrs. Coffman said that Mrs. Long was in much worse condition than she had been in February, 1978, when she had last seen her. When Mrs. Coffman showed up at the nursing home, Mrs. Long did not recognize her until she identified herself. She testified that Mrs. Long was unable to remember events of the past; said that her home in Smithville was just like it was when she walked out of it, when the house had in fact been sold by Mr. Doyle acting under a power of attorney; did not know where she was with reference to Smithville; was unable to dress herself; could not see and was hard of hearing; was confined to a wheelchair; said her eyesight was gone and her mind was gone.

The most telling testimony was given by Mrs. Nadine Shaffer, a second cousin to Mrs. Long. She had maintained close contact with Mrs. Long over a period of a great many years. Mrs. Shaffer had visited Mrs. Long many times during the period of ap-

proximately one year that Mrs. Long was in the Kendallwood Nursing Home in Clay County. She visited her less frequently after she moved to the Lawson Nursing Home in December, 1979, but she had visited her four times at the Lawson location. One of those visits was in the company of Mrs. Coffman in May of 1981.

Mrs. Shaffer testified that she would identify herself to Mrs. Long when she went to visit her, and Mrs. Long would recognize her. She said that she and the members of her family as they visited Mrs. Long would identify themselves. Mrs. Shaffer testified to Mrs. Long's behavior and her appearance during her visits to her at the nursing home. She said that Mrs. Long would quickly forget who Mrs. Shaffer was; Mrs. Long would forget where she was in conversation, that her mind would "trail off" or "wander off"; that Mrs. Long said that she could not hear or think; that she was poorly groomed; said she still owned her Smithville house, and wanted Mrs. Shaffer to go to the house and get her D.A.R. certificate and get a number from it; that she was "very disoriented"; "could not follow for any length of time in your conversation", "very frail". Mrs. Shaffer said it was very difficult to establish conversation with Mrs. Long; that Mrs. Long was not able to recall recent events; that she repeatedly asked the same questions, and that they were not coherent. Mrs. Shaffer said that during the Kendallwood period Mrs. Long would recognize Mrs. Shaffer when she came to visit, but after being moved to Lawson she no longer would recognize her.

Scotty Shaffer, a son of Nadine Shaffer, corroborated the testimony of Mrs. Coffman and of his mother, Mrs. Shaffer.

Dr. Trimble, testifying from the diagnoses that other physicians had made, said that Mrs. Long was suffering from hypertensive cardiovascular disease and vertigo and senile dementia intra and extra cranial atherosclerosis with infarction of the right temporal and parietal lobes. Both Dr. Trimble and Dr. Barth, who observed Mrs. Long later, said that she was suffering from or-

ganic brain syndrome or senile dementia, which is a rather non-specific diagnosis. Neither of them expressed a positive opinion as to whether she was competent to handle her business affairs.

Mrs. Long's affairs had been handled, as before noted, by appellant Louie E. Doyle. Mr. Doyle testified that his wife, Ada, was a cousin of Mrs. Long. While Mr. Long was still alive, in 1977, according to Doyle's testimony, Mr. and Mrs. Long got in touch with him to assist them. He was helping Mr. and Mrs. Long with their affairs before Mr. Long's death, and that Mrs. Long insisted that he continue to help her with her affairs after Mr. Long's death on January 20, 1978. About six months later Mrs. Long went to the bank and put Mr. Doyle's and his wife's names on her accounts with her. Mr. Doyle testified that he entered into a partnership with Mrs. Long about two years before the hearing, which would have been in mid-1979. At some point Mrs. Long executed a power of attorney in Mr. Doyle's favor. Under this power of attorney Mr. Doyle conveyed the Smithville house to a Mr. and Mrs. Eads in June of 1981, and sold and conveyed a 103-acre tract to a Mrs. Crenshaw for $188,000. He also sold a 90-acre tract to Earl Moore for $153,000, sold 26 acres to a Mr. Krill for $53,000, and sold 10 acres to Mr. McFadden for $20,000. Whether the last three conveyances were made under the power of attorney is not clear.

The partnership between Mr. Doyle and Mrs. Long seems to have been an informal affair. Doyle said that Mrs. Long brought into the partnership about a thousand acres of land, $6,000 in cash and a little bit of machinery. The living expenses of both partners were taken out of the partnership account.

Mr. Doyle has built a residence on the farm at a cost of $200,000, which is occupied by himself and his wife. He testified that the building of this house was approved by Mrs. Long, and originally it was intended that she live there with Mr. and Mrs. Doyle. The cost of the house, $200,000, was borrowed and a mortgage given on 73.5 acres

where the newly-constructed house is located, to secure the payment of the same. This $200,000 was an obligation of Mrs. Long. There is no testimony whether the documents evidencing this debt and mortgage were executed by Mr. Doyle under a power of attorney or by Mrs. Long herself.

A statement of Bess Long's "approximate" assets and liabilities as of August 12, 1981, prepared by Louie Doyle, shows other notes of $30,000 and of $20,494 as liabilities. The $30,000 note is designated "farm one-half" and the $20,494 note is designated "farm machinery one-half". These may be partnership notes.

Mr. Doyle's testimony presents a somewhat different picture of Mrs. Long's condition than does the testimony of petitioner's witnesses. His testimony presents her as acute in business matters, able to confer intelligently about the operation of the partnership business, and one who had initiated some of the far-reaching actions of the partnership. Mr. Doyle said that she had directed the sale of her Smithville residence to the purchasers, Mr. and Mrs. Eads.

Mrs. Long herself was called as a witness. She seemed oriented as to time and place, but was vague on many points. She said that she hadn't lately counted up how much land she had and didn't know how much she had. She didn't know whether any of it had been sold and she guessed she owned about as much land as she ever had. She said, however, that her house at Smithville had been sold. She knew that there had been a house built on her farm. She did not know how much it had cost but knew that it was expensive. She didn't believe she owed any money. She expressed confidence in Louie Doyle and was satisfied with his management of her money. She had some cousins, she said, and she named Emma Coffman as one of them, but she was unable to remember the others.

■ It is clear from the foregoing summary of the evidence of the case that there was substantial evidence from which the trial judge could conclude that Mrs. Long was no longer competent to manage her affairs and to care for herself. The testimony of Mrs. Shaffer and other of Mrs. Long's relatives who had maintained frequent contact with her through the years showed Mrs. Long to be physically feeble and without the mental faculties to deal even with simple daily affairs, let alone engagement in a general partnership involving extensive farming operations. It is worth noting that on at least one occasion when Mrs. Coffman and Mrs. Shaffer were paying a visit to Mrs. Long, that Mrs. Long thought that she still had her residence in Smithville and even directed Mrs. Shaffer to go there to secure some information from a document. At the time of the trial she did not know that four tracts of her farm real estate, in addition to the Smithville house, had been sold, and her farm acreage reduced by 236 acres. She did not know that she owed any money, when the fact was, according to Mr. Doyle's testimony, she owed $200,000 for the house which had been built on the place for Mr. and Mrs. Doyle's residence, in addition to two partnership notes.

■ Appellants argue that the opinions of Emma Coffman, Mrs. Nadine Shaffer and Scotty Shaffer, that Mrs. Long was not mentally competent to handle her affairs, did not constitute substantial evidence of the fact. It is true that the naked opinions of these witnesses would probably not have supported the trial court's judgment of incompetency, *Dowling v. Luisetti*, 173 S.W.2d 381, 385–86 (Mo.1943), *Matter of Armstrong*, 573 S.W.2d 141, 145 (Mo.App. 1978), but each one of these witnesses detailed facts upon which their opinions were based. Even without the opinions expressed by the witnesses, the trial judge could have drawn the same conclusion from the facts testified to by the witnesses.

■ Appellants complain about what they call the remoteness of some of the facts testified to by the witnesses, the most remote of which was January 20, 1978, 43 months prior to the date of the hearing. In each case, however, Mrs. Long's deterioration was traced to a time as recently as May, 1981, only three months prior to the

commencement of the hearing. Appellants have no justifiable complaint on the grounds of remoteness of the court's consideration of testimony of facts as far back as January 20, 1978 (which was the date of the death of Mrs. Long's husband). Although at some point evidence may become so remote in time as to be inadmissible, it is generally said, in cases like this, that remoteness goes to the weight to be given to testimony, not to its admissibility. The weight to be accorded to the testimony which is criticized as too remote is a prerogative of the trier of fact. 29 Am.Jur.2d, Evidence, § 253 (1967); Conrad, Modern Trial Practice, § 28 (1956); *State v. Woods,* 508 S.W.2d 297, 300 (Mo.App.1974). The court did not err in admitting the criticized testimony.

■ The cases cited by the appellant, *Matter of Armstrong,* supra; *In Re Delany,* 226 S.W.2d 366 (Mo.App.1950); *Harriford v. Harriford,* 336 S.W.2d 113 (Mo.App.1960), are all clearly distinguishable upon the facts and it is not necessary to make a point-by-point comparison between the case before us and any of those cases. In the case before us, one could select testimony which if believed and given a certain weight as over against testimony to the contrary, would lead to an opposite judgment. But credibility and weight of conflicting testimony are for the fact trier, and our task is at an end when we decide, as we have, that there was substantial evidence to support the trial court's judgment. *Murphy v. Carron,* 536 S.W.2d at 32; *Graff v. Triple B Development Corp.,* 622 S.W.2d 755, 756 (Mo.App.1981).

The judgment is affirmed.

WASSERSTROM, J., concurring.

MANFORD, P.J., dissenting in separate opinion.

MANFORD, Presiding Judge, dissenting.

I must dissent in this case for the simple reason that the evidence is not substantial to support the judgment *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976) and the majority opinion has chosen to ignore and re-

fused to apply the correct caselaw to such proceedings, *Matter of Armstrong,* 573 S.W.2d 141, 144 (Mo.App.1978), and cases adopted therein.

This is a direct appeal from a judgment in order form adjudging Bess Brooks Long incompetent and appointing a guardian over her person and estate. The judgment should be reversed.

A separate appeal was filed on behalf of Bess Brooks Long (WD 33307), and that proceeding was, by order of this court, consolidated with the instant proceedings.

The sole point presented on this appeal is that the trial court erred in its judgment declaring Bess Brooks Long incompetent and in its appointment of a guardian of her person and estate because there is no substantial evidence to support the judgment, and the trial court erroneously applied the law.

Before addressing the precise questions on appeal, it must be noted that this cause was tried to the court. Review by this court is prescribed by Rule 73.01 and *Murphy v. Carron, supra.* In addition, however, because this proceeding was in the nature of a competency hearing, the rule announced in the *Matter of Armstrong* and the rule in *In Re Delany,* 226 S.W.2d 366, 373 (Mo.App.1950) (reaffirmed in *Armstrong*) also apply.

By trial's end of this matter, a voluminous record had been compiled. The greater portion of the record deals with evidence related to the nature, extent, and details of the property of Bess Brooks Long and how she and other parties relate to that property. The evidence was presented more in the form and format prescribed in an action for an accounting. This was objected to repeatedly by counsel for Long and for appellant Doyle on the basis that such evidence was immaterial and irrelevant. The trial court continuously overruled these objections on the basis that such information was essential to the determination of the question of Long's competency. While this court disagrees with the trial judge, this explanation is set forth not as any criticism,

but rather to point out the reason for very limited reference to Long's property. The issue upon trial and on this appeal is exclusively whether the evidence supports a finding and judgment that Bess Brooks Long was incompetent, necessitating the appointment of a guardian of her person and estate.

There were no findings of fact or conclusions of law entered by the trial court and the record does not reveal any request for them by any of the parties.

*Armstrong* and *Delany* declare the test or standard by which evidence in an incompetency proceeding is to be measured. Delany declared:

"[F]or one to be held of unsound mind so as to be disqualified from the control of his own property, there must be such mental impairment as to render him incapable of understanding and acting with discretion in the ordinary affairs of life . . . and there is no basis for an adjudication that one is of unsound mind and incapable of managing his affairs unless it is shown that his powers of reasoning and comprehension have been so far destroyed or reduced by mental weakness from one cause or another that he is incapable of knowing and appreciating the nature and consequences of his acts in respect to his own conduct and the management of his property . . . (citation omitted)."

*Armstrong* adopted the rule of *Delany*, and then proceeded to reaffirm the rule in *In Re Bearden*, 86 S.W.2d 585, 594 (Mo.App. 1935). Bearden declared, "there may exist impairment of the mind, confusion and lack of clear understanding of reason, yet if there exists sufficient reason and clearness of mind for an understanding of the nature of his act or acts in the ordinary transitions of life . . ." In adopting this rule, this court in *Armstrong* added ". . . there could be a finding the person was of sound mind and capable of managing his own affairs." (*Armstrong* at 144)

Bess Brooks Long, at the time of trial, was 92 years of age and the widow of a rather successful farmer in Clay County, Missouri. Over the years, she and her husband had established land holdings exceeding 1,100 acres. They farmed the property. In the last five years or so of his life, Mr. Long rented some of the property. As his health failed, and prior to his death, he and his wife contacted appellant Doyle regarding the continued operation of their farm. The three agreed Doyle could undertake the operation. The evidence shows that Doyle terminated one tenant, recovered about 200 acres of land lost to weed growth, and returned it to production and commenced restoration of one of the houses on the property. Mr. Long died. Bess Long then granted a power of attorney to Doyle. Bess Long was, at this time, living in a city residence in Smithville, Missouri. Her health failed and, after a brief hospital stay, she was placed in a nursing home in Smithville. She later was transferred to her present nursing home residence at Lawson, Missouri.

The record reveals that Bess Long and Doyle entered into an informal partnership in regard to the farming operation. The land owned by Bess Long was never transferred by deed to the partnership. In the months which followed, Doyle sold certain parts of the land, reducing the remaining acreage to something just less than 1,000 acres. The parcels sold were non-productive tracts. Monies and deeds of trust were involved in these transactions, and the evidence reveals that Doyle deposited all these monies in the "joint farming account". Doyle, his wife, and Bess Long are parties jointly on three farming accounts.

In addition to the foregoing, there was evidence that two houses on the property were renovated for a sum total of $50,000. The renovation of one of these houses commenced prior to the death of Mr. Long. The renovation of the other occurred after Mr. Long's death. The evidence further reveals that the Smithville residence of Bess Long was sold by Doyle for $40,000 and the monies deposited in the joint farm accounts. The evidence revealed that the monthly Social Security benefits to Bess Long were deposited in the joint farm

accounts. Also, Doyle testified to placing some $91,000 to $95,000 of his own funds into the joint farming accounts. Doyle's wife collects a monthly Social Security benefit and funds from that source have been deposited from time to time in the joint farming account. The entire living expenses of Bess Long and the Doyles, plus the farming operation expense, are paid from the three joint farming accounts. The evidence also reveals that there was a new residence constructed on the farm property. Its cost was placed at $200,000. Doyle testified that Bess Long and he discussed construction of this residence as early as two years prior to trial. He stated Bess Long insisted on extra wide hallways to accommodate her wheelchair, that the house be a ranch style so as to be on one level and that it include a whirlpool bath facility. The only evidence on this came from Doyle and the evidence remained uncontradicted that Bess Long agreed to the construction of this residence along with the special design factors mentioned above. Doyle testified that it was the intention of Bess Long and he and his wife that they all live in this new residence after Bess Long recovered and was able to reside there. The evidence reveals that Doyle and his wife are to receive the bulk of Bess Long's estate by will. It was the testimony of Doyle that all of the various details of the farming operation, the sale of properties and the construction of the new residence were continuously discussed with Bess Long, and that she understood and agreed to these transactions.

The petitioner (Coffman) herein is a cousin of Bess Long and a resident of Chicago, Illinois. She testified that she visited Bess Long in 1930, 1932, 1962, 1972, 1976, and 1978 for brief visits of up to 10 days. The visit in 1978 was on the occasion of Mr. Long's death. Petitioner then visited Bess Long on January 20, 1980 (for a month) and in May, 1981. These last visits were for a period of perhaps an hour or so. Petitioner testified that Bess Long was in poor physical condition. She was permitted, over objection, to give her opinion of the mental condition of Bess Long. Petitioner concluded Bess Long was not capable of handling her affairs.

The trial court, in overruling the objection, declared, "I think she (petitioner) can testify as to whether or not she considers her (Bess Long) to be capable or incapable . . ." The evidence which preceded petitioner's opinion included the following. Bess Long was physically limited. (This fact was virtually agreed to by the parties as the record disclosed Bess Long had a serious hearing impairment as well as being almost blind). Petitioner testified she visited Bess Long in May, 1981, shook hands with her, and asked Bess Long if she knew who she was. Petitioner testified that Bess Long addressed her by the first name of another relative. In addition, petitioner testified she asked Bess Long what she was going to do with her home in Smithville or if the home was like it had been, and Bess Long replied, "the house was just the same as it was when she walked out of it." (i.e., it must be remembered this property had been sold). Petitioner further testified that Bess Long told her she did not know which direction she lived from Smithville at the nursing home. Petitioner admitted she had no discussion with Bess Long about who was handling her affairs or any details about such matters. Upon cross-examination, petitioner acknowledges Bess Long knew who she was after petitioner identified herself.

The physician for Bess Long testified that Bess Long suffers from senile dementia. The doctor, however, further stated that persons suffering from this disorder can have temporary improvement or lucid intervals. He further stated that the term *senile dementia* is a loosely-used generic term and that persons who suffer from it can range all the way from those completely disabled to others who can function quite well. *The doctor testified that no mental or psychiatric examinations were performed. He testified that he had general conversations with Bess Long about her farming operations and Doyle and that she would respond in conversation. He stated he never discussed her business affairs in specific detail or her day-to-day business*

matters. *He further acknowledged he knew nothing about her ability or lack thereof to care for her daily feeding, clothing, and grooming habits.* On cross-examination, he was asked and responded:

"Q. ... Doctor, the question really to be resolved here is one that I'm going to read you from a case and I want you to tell me whether you agree with that or disagree with it and I believe you said you'd disagree with that statement, and I'll read the statement and see if again, you tell me you'd disagree with it. 'Is Bess Brooks Long incapable of knowing and appreciating the nature and consequence of her acts in respect to her conduct in the management of her property?' I asked you that question (from the doctor's deposition) and you said you'd disagree with that, isn't that true?

A. Yes.

Q. Right. *In other words, what you're saying is you believe that she is capable of knowing and appreciating the nature and consequence of her acts in respect to her conduct in the management of her property, isn't that true?*

A. *In a general—yes, in a general way."*

*The doctor also stated that the failure of Bess Long to always recognize him could be attributable to her very poor sight and hearing.* The doctor stated her overall condition had improved since he first started treating her. From the whole of his testimony, the doctor placed great emphasis upon the temporary memory loss of Bess Long.

Two additional witnesses called in support of the petitioner were individuals who prepared tax returns for Long and Doyle. Neither provided any evidence bearing directly upon the main issue in this case.

Petitioner then called as a witness, Clara Shaffer, a second cousin of Bess Long. This witness testified to regular visits with Bess Long and her husband many years in the past. Timely objection to the testimony on the basis of remoteness was overruled. The witness then testified she visited Bess Long in 1979 and then again the 25th or 26th day of May, 1981. This witness testi-fied that Bess Long had "much difficulty" in following or initiating a conversation. She also stated she had to identify herself to Bess Long and that Bess Long declared she could no longer see, no longer hear, and could not think. This witness could not testify of her own knowledge whether Bess Long could care for herself daily. She also testified Bess Long claimed to still own her home in Smithville and it was just the way it was when she had left it to enter the nursing home. This witness never discussed business affairs with Bess Long. On cross-examination, this witness admitted Bess Long recognized her after she told Bess Long who she was. On further cross-examination, this witness admitted Bess Long initiated conversation and asked what she was doing. The two had conversation about a club both had attended in the past and about the family of the witness. Over objection, this witness was permitted to testify Bess Long was incompetent.

Medical records of Bess Long were admitted over objection. The significant portions of those records listed Bess Long as suffering from organic brain syndrome. In addition, these records revealed a deterioration of the central nervous system. *This latter ailment, however, carried a physician's note that it might be the result of medication.*

Petitioner then called as a witness, Scotty Shaffer, the adult son of Nadine Shaffer who had testified earlier. This witness stated he had last visited Bess Long in May, 1981. Upon his visit, he had to identify himself. This witness also stated that Bess Long referred to her house in Smithville, that it was just as she had left it, and that it was awaiting her return. He further stated that during their conversation, Bess Long would pause or stop in the middle altogether, or would start talking about something entirely different. This witness testified Bess Long got the name of his wife and another relative confused. This witness testified he and Bess Long discussed her farming operation and that she discussed the types of crops grown and the harvest. As a result of two meetings with Bess Long in October of 1980 and May of

1981 of approximately an hour's duration, this witness concluded that she was incompetent because she had difficulty in carrying on a conversation, could not remember current events (i.e., what she had for lunch) that she could relate and discuss in detail things long since past, but that she would preface responses to questions asked her with the remark: "Now, I just don't know whether I'm telling this right or not."

Petitioner then called as a witness, Louie Doyle. Numerous pages of testimony are in the record relative to the business transactions and properties. On the issue of incompetency of Bess Long, Doyle testified that except for a period of hospitalization as a result of his suffering a heart attack, he and his wife visit Bess Long every day and discuss the affairs and decisions about the farming operation. Doyle stated that Bess Long, his wife, and he discussed the building of the new residence in 1978. He further stated that Bess Long knew of all the sales of land parcels as well as the sale of her residence in Smithville. Doyle further testified that it was Bess Long's suggestion and insistence that the farm be renovated and restored to a productive operation. Doyle stated that Bess Long inquires of him daily what he has accomplished. He further stated that although impaired in sight and hearing, as "far as financing, she still—she was always a wizard and she still is." He stated that Bess Long would not discuss business affairs with "strangers". When asked about the loss of direction by Bess Long, Doyle explained in describing the nursing home, ". . . a good part of the people go in there and get turned around because they build that on that spoke deal." Doyle testified Bess Long is capable of managing her own affairs.

Petitioner then called the final (and the most critical) witness in the entire proceedings, Mrs. Bess Long. In summary, her testimony revealed that she knew she was in the courtroom, responded to the administration of the oath, acknowledged where she lived, but did not know the day of the week or the date, but did identify the proper month of the year. She then stated she did not know whether any of her land had been sold. She then was asked if she still owned a house in Smithville and she testified, "I did, but I've sold it." When asked to whom she sold it, she stated the name "slipped" her memory, but given time, she could remember. She also stated she was aware of the new residence being built on the farm. When asked if she knew what the house cost, she responded, "Well, no not exactly. I know it was expensive." She was then asked, "What's expensive to you?" She responded, "Well, what would be expensive to me when I was there wasn't a very high amount. But, however, the real estate values nowadays are much higher than they were." She then testified she owed no debts and that Doyle keeps all her records and she has no reason to object to anything he does about her affairs. She disclaimed any knowledge of the purchase of farm machinery. She stated she did not write checks because of her sight limitation. She further testified that she and Doyle had a partnership agreement through which Doyle does the work and she pays bills on the operation. She acknowledged she had relatives and named petitioner. She could not recall Doyle's phone number, but identified her physician. Then she was asked if she could add. She was asked, "Can you remember, for example, what 10 plus 4 is?" She answered, "40". "Can you remember what 7 minus 3 is?" She answered, "Seven minus 3 would be 4." "Can you remember what 5 plus 7 is?" She answered, "Five and 7 are—5 are 12. My—I can think fairly well, but what I can't do is, I can't see. You're greatly handicapped when you can't see." She was asked if she had a hearing impairment and she responded, "I don't hear very acutely, but I hear better than I see." She further testified she was happy the way Doyle was handling her affairs, and "He keeps me posted on whatever they're doing."

The evidence closed and the court entered judgment.

Under the test prescribed in *Armstrong, Delany,* and *Bearden,* the evidence upon the instant record fails to establish that Bess

Long's power of reasoning and comprehension have been so far destroyed or reduced that she is incapable of knowing and appreciating the nature and consequences of her own acts in respect to her own conduct and the management of her property. There is no question that Bess Long suffers impairment, but the evidence is not substantial to support a finding that she is incompetent under the test within *Armstrong, Delany,* and *Bearden.*

The judgment should be reversed.